**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                                   **Case No.  3:13cr17/MCR**

**LONGIE T. HARRIS, JR.,**

      **Defendant.**

_____/

## ORDER

      The Defendant is charged in a one-count indictment with possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g) and 924(e).  The matter is before the court on the Defendant's motion to suppress evidence seized during a traffic stop.  The court conducted an evidentiary hearing on May 20, 2013.  Having carefully considered the testimony, evidence, and arguments of the parties, the court finds that the Defendant's motion should be granted.

**BACKGROUND**

      While on patrol on the evening of September 3, 2012, Deputy Pawal Wieszadlo of the Escambia County Sheriff's Office observed a tan Dodge Caravan with a crack in the lens cover of the left rear taillight through which white light emitted.[1]  After following the vehicle for approximately one block, Deputy Wieszadlo initiated a traffic stop.[2]  When he approached the vehicle, Deputy Wieszadlo asked the Defendant for his driver's license.

---

[1] The vehicle was driven by the Defendant.

[2] According to the offense report, Deputy Wieszadlo stopped the vehicle because it had a "left driver's side broken taillight lens and a white light protruding through it."  Although Deputy Wieszadlo did not appear at the hearing, Officer Mikel Lee of the Pensacola Police Department, who followed behind Deputy Wieszadlo in a separate vehicle and assisted with the stop, testified that Deputy Wieszadlo stopped the vehicle for the reason stated in the offense report.

Case No.: 3:13cr17/MCR

Rather than produce a driver's license, the Defendant handed Deputy Wieszadlo a Florida Identification Card.  When Deputy Wieszadlo inquired further, the Defendant admitted he did not have a valid driver's license.  Deputy Wieszadlo returned to his patrol car and ran a check on the Defendant, which revealed that the Defendant's license had been revoked. Deputy Wieszadlo thus asked the Defendant to exit the vehicle, and as he did, Deputy Wieszadlo observed a firearm on the left side of the driver's seat.[3]  After learning that the Defendant was a convicted felon, Deputy Wieszadlo placed him under arrest for driving with a suspended license and possessing a firearm as a convicted felon.  The Defendant seeks to exclude evidence of the firearm and ammunition, as well as all statements he made during the course of his arrest,[4] arguing that the seizure violated his Fourth Amendment rights because the traffic stop was not supported by probable cause and therefore was invalid.  For the reasons set forth below, the court agrees.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop constitutes a seizure for Fourth Amendment purposes. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  "To satisfy constitutional concerns, a traffic stop requires either probable cause to believe a traffic violation occurred or reasonable suspicion of criminal activity."  *United States v. Parker*, No. 12-14142, 2013 WL 1104098, at *1 (11th Cir. March 18, 2013).  "A determination of probable cause rests on objective factors, and the officer's subjective motives in making the stop are irrelevant." *United States v. Peguero*, No. 11-13043, 2013 WL 1909036, at *1 (11th Cir. May 9, 2013) (citing *Whren*, 517 U.S. at 813); *United States v. Lewis*, 674 F.3d 1298, 1304 n.3 (11th Cir. 2012) (holding that "a police officer's subjective motivations for conducting a stop have no bearing on the *objective* inquiry into whether the stop is reasonable under the Fourth

---

[3] The firearm was loaded with two bullets.

[4] After being read his *Miranda* rights, the Defendant stated that he purchased the firearm for $12.00 from a young man in a nearby park.

Case No.: 3:13cr17/MCR

Amendment") (emphasis in original); *United States v. Harrelson*, 465 Fed. Appx. 866, 868 (11th Cir. 2012) ("To determine whether the officer had probable cause, we do not focus on the officer's subjective motives; rather, we focus on whether the circumstances, viewed objectively, justified the stop.").  "'[A] traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment.'" *Peguero*, 2013 WL 1909036, at *1 (quoting *Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)).  "As the Supreme Court has explained, 'what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable.'" *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990)).  "This rule provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justification for their actions," so long as the legal justification is objectively grounded. *United States v. Lopez-Valdez*, 178 F.3d 282, 288 (5th Cir. 1999).  In other words, "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment . . . ." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir.1998).  A mistake of law, however, can never provide probable cause for a traffic stop, *see Chanthasouxat*, 342 F.3d at 1279, because the "'failure to understand the law by the very person charged with enforcing it is *not* objectively reasonable,'" *United States v. Rosvall*, 651 F. Supp. 2d 1274, 1276 (D. Utah 2009) (quoting *United States v. Tibbetts*, 396 F.3d 1132 (10th Cir. 2005) (emphasis in original)).

Here, the Defendant was stopped because the vehicle he was driving had a cracked taillight lens cover that allowed for the emission of white light.[5]  He was cited for a violation of Fla. Stat. § 316.610, which makes it unlawful

> for any person to drive . . . on any highway any vehicle . . . which is in such unsafe condition as to endanger any person or property, or which does not contain those parts or is not at all times equipped with such lamps and other equipment in proper condition and adjustment as required in this chapter, or which is equipped in any manner in violation of this chapter, or for any person to do any act forbidden or fail to perform any act required under this chapter.

The statute further provides that if a law enforcement officer has "reasonable cause to believe that a vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair," he may "require the driver of the vehicle to stop and submit the vehicle to an inspection and such test with reference thereto as may be appropriate."  Fla. Stat. § 316.610(1).  In order to determine whether a stop was justified under § 316.610(1), courts should consider the Florida statutes "that delineate specific equipment requirements."  *Paul v. State*, 991 So. 2d 404, 405 (Fla. 2nd DCA 2008); *see also Hilton v. State*, 961 So. 2d 284, 290 (Fla. 2007) (holding that "for a stop to be constitutional under the 'not in proper adjustment or repair' section of 316.610(1), the equipment defect or damage must be in violation of the law"); *Doctor v. State*, 596 So. 2d 442, 446 (Fla.1992).

The Government relies on three statutes in support of its argument that Deputy Wieszadlo's stop of the Defendant was justified under Florida law and thus was reasonable

---

[5] The government offered a photograph of the taillight at the hearing.  The top portion of the lens cover, which was clear plastic, was largely missing.  The lower portion, which was red, remained intact other than a minor crack.

under the Fourth Amendment.[6]  First, the Government references Fla. Stat. § 316.224, which requires that

> [a]ll lighting devices and reflectors mounted on the rear of any vehicle . . . display or reflect a red color, except the stop light or other signal device, which may be red, amber, or yellow, and except that the light illuminating the license plate shall be white and the light emitted by a backup lamp shall be white or amber.

According to the Government, a taillight that shines or reflects any color other than red violates Florida law.[7]  This position has no support in Florida law.  Indeed, although Fla. Stat. § 316.224 requires that all rear-mounted lights display or reflect a red color, it does not require that the lens covers of such lights be free from cracks or that there be no emission of white light.  *See Paul*, 991 So. 2d at 406.  Moreover, the Government has not provided – nor has the court found – any Florida case standing for the proposition that a crack in the lens cover of a taillight allowing some white light to emit constitutes a statutory traffic violation.  To the contrary, Florida courts have repeatedly found that white light emitting through a crack in a taillight lens cover does not render a vehicle noncompliant under Fla. Stat. § 316.224 and that such a defect constitutes a statutory violation only if no red light is emitted from the taillight.  *See Doctor,* 596 So. 2d at 446-47 (holding that "a reasonable officer would have known that [Defendant's] vehicle was in compliance with the law since red taillights were visible on both ends of the vehicle" despite the emission of white light); *Johnson v. State*, 888 So. 2d 122, 124-25 (Fla. 4th DCA 2004) (holding that

---

[6] "[U]pon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution."  *United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. 2009).

[7] The Government does not dispute that the taillight emitted red light.  In fact, Officer Lee confirmed that red light emitted from the taillight and that the red portion of the taillight lens cover was substantially intact.  Moreover, it is clear from the photograph that the red portion of the taillight lens cover predominated and that mostly red light would have been emitted.  Thus, the court presumes the defendant's vehicle complied with Fla. Stat. § 316.221(1), which requires that all motor vehicles be equipped with at least two rear taillamps that emit a "red light plainly visible from a distance of 1,000 feet to the rear."  In any event, the Government did not rely on that statute as justification for the stop and offered no evidence regarding the distance from which the red light at issue could be seen.

appellant made a *prima facie* showing of ineffective assistance of counsel where his attorney failed to challenge the legality of a stop initiated because of white light emitting through a cracked lens cover of a brake light); *Frierson v. State*, 851 So. 2d 293, 296 (Fla. 4th DCA 2003) (noting that a cracked lens cover, as opposed to a cracked taillight, is not "violative of the law"), *quashed on other grounds*, 926 So. 2d 1139 (Fla. 2006).

In *Doctor*, officers stopped the defendant's vehicle pursuant to Fla. Stat. § 316.610 because of a crack in the lens cover of the left rear taillight. *Doctor*, 596 So. 2d at 446. In deciding whether the stop was justified, the Florida Supreme Court considered Fla. Stat. § 316.610 in conjunction with other statutes that "delineate the specific equipment requirements for vehicles" and found only one statute applicable, that being Fla. Stat. § 316.221(1), which requires all vehicles to be equipped with at least two rear mounted taillights that emit a red light plainly visible from a distance of 1,000 feet to the rear. *Id.* According to the evidence in *Doctor*, the defendant's vehicle had two sets of rear lights, each of which was equipped with a signal light on the outside, a brake light, a reverse light, and a lens cover or reflector, one of which was cracked. One of the officers confirmed that the taillights operated as intended on each side of the rear of the vehicle, despite the crack. The court therefore found that the vehicle was in compliance with the statute and, as a result, that the stop was improper, rejecting the State's argument that Fla. Stat. § 316.610 "allows police to stop a vehicle for malfunctioning equipment, even if the equipment is not required by statute, poses no safety hazard, or otherwise violates no law." *Id.* at 447. According to the Florida Supreme Court, "[s]uch an interpretation of section 316.110 [sic] would allow police to stop vehicles for malfunctioning air conditioners or even defective radios, a result clearly beyond the statute's intended purpose of ensuring the safe condition of vehicles operating on our state's streets and highways." *Id.* The court rejected the State's position that the stop was legal because the officers "reasonably suspected" that the taillight was in violation of the law, noting that reasonable suspicion is based on an objective standard and that law enforcement officers are charged with knowledge of the law. *Id.* (internal marks omitted). As the court pointed out, a "reasonable officer would

have known the statutory requirements for taillights as prescribed by section 316.221" and thus likewise "would have known that [the defendant's] vehicle was in compliance with the law since red taillights were visible on both ends of the vehicle."[8]  *Id.*

Several years after the decision in *Doctor*, the United States Supreme Court considered whether "a traffic stop is permissible as long as a reasonable officer in the same circumstances *could have* stopped the car for the suspected traffic violation," even if the police officer conducting the stop subjectively believed that an occupant of the vehicle was engaging in illegal behavior.  *See Whren*, 517 U.S. at 809 (emphasis in original).  In answering the question in the affirmative, the Court rejected the "principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred" and held that police officers' subjective intentions have no bearing on the reasonableness of a traffic stop, which hinges solely on the objective validity of the basis offered by the officer who made the stop.  *Id.* at 811, 813.  The Court noted that it has "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification" for a stop.[9]  *Id.* at 812.

The Supreme Court's rejection of any consideration of subjective motivations and adoption of a purely objective test in *Whren* cast doubt on the continued validity of *Doctor*.  However, in *Hilton v. State*, 961 So. 2d 284 (Fla. 2007), a case involving a stop based on

---

[8] In finding the stop unlawful, the court relied on the "reasonable officer" standard set forth in *Kehoe v. State*, 521 So. 2d 1094 (Fla. 1998), which required the State to show that, under the facts of the case, a reasonable officer "*would* have stopped the vehicle absent an additional invalid purpose,'" which, in *Kehoe*, was suspicion of drug trafficking.  *Doctor*, 596 So. 2d at 446 (quoting *Kehoe*, 521 So. 3d at 1097) (emphasis in original).  *Kehoe* was later abrogated by *Dobrin v. Fla. Dept. of Highway Safety and Motor Vehicles*, 874 So. 2d 1171 (Fla. 2004), based in part on *Whren v. United States*, 517 U.S. 806 (1996).  *See infra*.  The Florida Supreme Court clarified in *Dobrin* that "the correct test to be applied is whether the particular officer who initiated the traffic stop had an objectively reasonable basis for making the stop."  *Dobrin*, 874 So. 2d at 1174.

[9] The Court also rejected the petitioners' suggested standard – "whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given" – as being "driven by subjective considerations."  *Id.* at 814.  According to the Court, in urging such a standard, the petitioners sought to "prevent the police from doing under the guise of enforcing the traffic code what they would like to do for different reasons" – *i.e.*, render illegal any search stemming from a pre-textual stop  *Id.* at 813-14.

a crack in a vehicle windshield, the Florida Supreme Court confirmed *Doctor's* continued viability.[10]   In *Hilton*, the defendant filed a motion to suppress after being charged with possession of marijuana with intent to distribute,[11] arguing, among other things, that the stop was not justified because the crack in the windshield was barely visible and did not obstruct the driver's view.[12]  The trial court denied the motion, and the defendant appealed. The Second District Court of Appeal initially held that the officers lacked justification for the stop.[13]  It subsequently granted rehearing *en banc* and vacated its prior decision, finding that although the Florida statutes do not "specify under what circumstances an officer may stop a car to perform a safety inspection of a broken windshield, . . . an officer may stop a vehicle with a visibly cracked windshield regardless of whether the crack creates an immediate hazard," even if only to investigate.[14]  *Hilton v. State*, 901 So. 2d 155, 157 (Fla.

---

[10] Specifically, the court confirmed that "*Whren* did not overrule [the court's] utilization of principles of statutory interpretation to address whether section 316.610 of the Florida Statutes permits law enforcement officers to stop a vehicle for any type of malfunctioning equipment" and that the decision in *Doctor* regarding "what constitutes a traffic violation under Florida law" is still valid. *Id.* at 291 n.3.

[11] While confirming the defendant's identification, officers learned that the defendant had a felony conviction and was on probation.  They also observed what they believed to be a rifle in the defendant's vehicle.  As the officers were escorting the defendant from the vehicle to the curb, one of the officers detected the odor of marijuana.  He thus conducted a pat-down search of the defendant, which revealed forty-two bags of marijuana.  The defendant was arrested and charged with possession of marijuana with intent to distribute. He was not charged as a felon in possession of a firearm, presumably because the "rifle" turned out to be a BB gun. *Id.* at 286.

[12] The officers testified that the crack was approximately seven or eight inches long, had no loose glass, and may not have obstructed the driver's view.

[13] In particular, the court noted that while Fla. Stat. § 316.2952 mandates that vehicles be equipped with a windshield and have working windshield wipers, it does not address cracks in windshields.  As a result, the court concluded there was no violation of Fla. Stat. § 316.610 in the absence of proof of an unsafe condition, which the state had not adduced. *See id.* at 287.

[14] Florida Stat. § 316.2952 requires that vehicles be equipped with "[a] windshield in a fixed and upright position, . . . with safety glazing as required by federal safety-glazing material standards." Fla. Stat. § 316.2952(1).  It specifies certain requirements, such as windshield wipers, and, with certain limited exceptions, prohibits signs, sunscreening materials, products, and coverings attached to, or located in or upon, the windshield. Fla. Stat. § 316.2952(2)-(4).

2d DCA 2005) ("*Hilton II*").[15]   The court offered three bases for its holding.  First, it noted that Fla. Stat. § 316.610(1) permits a stop when a vehicle is unsafe or has defective equipment, which the court construed as a clear indication that the legislature did not intend to "limit the authority of the police to only those cases in which the equipment created some immediate or heightened level of risk."  *Id*.  The court concluded that, because a windshield is required under Fla. Stat. § 316.2952, a windshield not in proper repair constitutes a violation of § 316.610.  *Id.*  Second, the court relied on Fla. Stat. § 316.610(2), which provides that

> [i]n the event the vehicle is found to be in unsafe condition or any required part or equipment is not present or is not in proper repair and adjustment, and the continued operation would probably present an unduly hazardous operating condition, the officer may require the vehicle to be immediately repaired or removed from use. However, if continuous operation would not present unduly hazardous operating conditions, that is, in the case of equipment defects such as tailpipes, mufflers, windshield wipers, marginally worn tires, the officer shall give written notice to require proper repair and adjustment of same within 48 hours, excluding Sunday.

Finally, the court concluded that "the power extended to the police in section 316.610(1) does not violate the Fourth Amendment," noting that the statute was "intended to create a noncriminal safety stop to permit police to perform a quick vehicle-specific safety inspection that is cheaper and less intrusive, and arguably more effective, than methods of mandatory, annual vehicle inspection."  *Hilton II*, 901 So. 2d at 157-58.  The court found it "reasonable for the legislature to require all automobiles to have certain equipment and for that equipment to be in proper repair" and indicated that "[o]wners and operators of cars are expected to know these legal requirements and should not expect their sense of personal privacy to prevent the police from briefly stopping a car that reasonably appears to have an equipment violation."  *Id.* at 158. The court further found that, "even if section

---

[15] The Florida Supreme Court referred to the first decision of the Second District Court of Appeal as "*Hilton I*" and the *en banc* decision as "*Hilton II*."  For consistency purposes, this court does the same.

316.2952 or section 316.610 stated that a cracked windshield would be a traffic violation only if it created an unsafe condition, an officer may be reasonable in his or her belief that the crack met such criteria, even though an examination of the windshield after the stop revealed that the crack did not create an unsafe condition." *Id.* at 159.  The court distinguished *Doctor* on the basis that it was decided before *Whren*; the vehicle at issue in *Doctor* was stopped based on a mistake of law; and there was no statutory violation in *Doctor*. *Id.*  The court thus affirmed the trial court's denial of the defendant's motion to suppress and certified the issue to the Florida Supreme Court as a matter of great public importance. *Id*. at 160.

The Florida Supreme Court rejected the Second District Court of Appeal's analysis, quashed the decision in *Hilton II*, and remanded the matter for further proceedings. *Hilton*, 961 So. 2d at 300.  Again relying on principles of statutory interpretation, the court noted that Fla. Stat. § 316.610 makes it unlawful to drive a vehicle that does not contain parts and equipment required by statute and that Fla. Stat. § 316.2952 requires only that a vehicle have a windshield in a fixed and upright position equipped with safety glazing, a driver-controlled cleaning device, and windshield wipers in good working order. *Id*. at 289. "[A]ny other problems with windshields, such as chips, dings, or cracks, are not within section 316.2952 and do not constitute a traffic violation under that statute." *Id*.  According to the Florida Supreme Court, "[t]o conclude that any defect or damage renders a vehicle's equipment 'not in proper adjustment or repair,' and, therefore, subject to stop and inspection by law enforcement officers pursuant to section 316.610(1), would ignore the language in the introductory paragraph of the statute which provides that it is a violation for a vehicle not to have equipment that is in proper condition or adjustment 'as required in this chapter.'" *Id*. at 289-90 (quoting Fla. Stat. § 316.610).  The court therefore concluded that Fla. Stat. § 316.610(1) "does not give officers the authority to stop a vehicle for any equipment defect or damage;" rather, "for a stop to be constitutional under the 'not in proper adjustment or repair' section of 316.610(1), the equipment defect or damage must be in violation of the law." *Id.* at 290.  In other words, if a defect is not prohibited by

statute, an officer may stop a vehicle based on such a defect only if it constitutes a safety hazard.[16] *Id*.

The Fifth Circuit Court of Appeals previously had held similarly in *Lopez-Valdez*, 178 F.3d 282, 289 (5th Cir. 1999). In that case, a law enforcement officer stopped the defendant's vehicle because of a hole in one of the vehicle's taillight lens covers that allowed both red and white light to be emitted, which the officer believed constituted a traffic violation.[17] The defendant, who ultimately was charged with willfully transporting illegal aliens, moved to suppress evidence obtained as result of the traffic stop, arguing that under Texas law a broken lens cover causing a taillight to emit both red and white light does not constitute a traffic violation and thus cannot serve as a legitimate basis for a traffic stop under the Fourth Amendment. The Fifth Circuit agreed, reversing the district court's decision denying the defendant's motion to suppress and noting that "if officers are

---

[16] In so holding, the court essentially adopted the analysis of the dissenting opinion in *Hilton II* with respect to the "necessary interaction between section 316.610 and other sections of chapter 316" and reaffirmed its prior rationale in *Doctor:*

> interpreting section 316.610 to authorize traffic stops for just any type of equipment malfunction, even if such equipment is not required by law, would permit officers to stop vehicles for such defects as a broken radio antenna or a dent in the passenger door of the vehicle. Further, even where certain equipment is required by statute, section 316.610 would permit stops where the equipment is in compliance with the statute but possesses some defect which is not specifically addressed or prohibited by statute. For example, section 316.252 of the Florida Statutes requires that trucks or semi-trailers of certain weights be "equipped with fenders, covers, or other splash and spray suppressant devices." § 316.252(1), Fla. Stat. (2005). Under the State's interpretation of section 316.610, if a truck is equipped with fenders, but those fenders are dented, law enforcement officers would be authorized to initiate a traffic stop. As this Court concluded unanimously in *Doctor*, placing such a broad interpretation on section 316.610 would produce results "clearly beyond the statute's intended purpose of ensuring the safe condition of vehicles operating on our state's streets and highways." 596 So. 2d at 447.

*Hilton*, 961 So. 2d at 292.

[17] Specifically, the officer believed the defect violated § 547.303 of the Texas Transportation Code, which provides that "[u]nless expressly provided otherwise, a lighting device or reflector mounted on the rear of a vehicle must be or reflect red" and "[a] signaling device mounted on the rear of a vehicle may be red, amber, or yellow."

allowed to stop vehicles based upon their subjective belief that traffic laws have been violated even where no such violation has, in fact, occurred, the potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive." *Id.* at 289.

Applying the decisions in *Doctor*, *Hilton*, and *Lopez-Valdez* to the instant case, the court concludes that Deputy Wieszadlo's stop of the Defendant's vehicle pursuant to Fla. Stat. § 316.610 violated the Fourth Amendment. Deputy Wieszadlo stopped the Defendant because the vehicle he was driving had a broken taillight lens cover from which white light emitted, something not prohibited under Fla. Stat. § 316.610. Accordingly, Deputy Wieszadlo's stop of the Defendant's vehicle was based on a mistake of law, which can never support a finding of reasonable suspicion or probable cause as a matter of law. *See Chanthasouxat*, 342 F.3d at 1279 (holding that "a mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop"). Therefore, the court finds that no reasonable law enforcement officer in Deputy Wieszadlo's position, correctly following Florida law, would have considered the vehicle driven by the Defendant to be in violation of Fla. Stat. § 316.610 based on white light emitting from the broken taillight lens cover.[18] *See Lopez-Valdez*, 178 F.3d at 289; *Lopez-Soto*, 205 F.3d at 1106; *Rosvall*, 651 F. Supp. 2d at 1278 (noting that "Utah law does not . . . demand that drivers operate only vehicles that are, at all times, in full compliance with all standards in the safety inspection manual" and that such a requirement "would place onerous and unrealistic duties on drivers and car owners"); *Hilton,* 961 So. 2d at 288-92; *Doctor*, 595 So. 2d at 447.

---

[18] In its response, the Government argues that the exposed bulb above the broken taillight lens cover provided probable cause for the stop and that it was reasonable for Deputy Wieszadlo to investigate whether the exposed light was a backup lamp or whether it was one required to display red or amber. The Government, however, offered no evidence at the hearing regarding the exposed bulb, including whether it constituted an unsafe condition or statutory violation. And Officer Lee testified that both red and white light emitted when the brake was applied.

Case No.: 3:13cr17/MCR

The Government also relies on Fla. Stat. § 316.235(3) to justify the stop, which requires that backup lamps not be lighted when a vehicle is in forward motion.[19]  The Government argues that, with the exception of the light illuminating the license plate, white light may be emitted from the rear of a vehicle only when the vehicle is in reverse motion. Once again, Florida law does not support the Government's position.  Florida Stat. § 316.235(3) does not prohibit the emission of white light from the rear of a vehicle, and the court is aware of no authority imposing such a ban.[20]  The court, therefore, also finds that the Government has failed to demonstrate that a reasonable law enforcement officer in Deputy Wieszadlo's position, correctly following Florida law, would have had probable cause to stop the Defendant for a violation of Fla. Stat. § 316.235(3).

Finally, the Government argues that any white light on the rear of a vehicle, other than the light illuminating the license plate, creates a safety hazard under Fla. Stat. § 316.610 by impairing the vision of other drivers and causing confusion as to whether the vehicle is moving forward or backward.  According to the Government, such a condition creates reasonable cause for an officer to believe the vehicle is unsafe, justifying a stop under Fla. Stat. § 316.610 for inspection purposes.  The Government is correct that a defect not prohibited by statute may constitute a traffic violation when the defect renders the vehicle unsafe such that person or property is endangered.  *See Hilton*, 961 So. 2d at 295.  Such a determination must be made on a case-by-case basis.  *Id.*  Accordingly, in this case, if Deputy Wieszadlo's belief that the cracked taillight lens cover rendered the vehicle unsafe under Fla. Stat. § 316.610 was objectively reasonable, he was justified in stopping the Defendant's vehicle regardless of whether the crack in fact constituted an

---

[19] The fact that the Defendant was cited for the violation of a different statute is of no consequence so long as there was probable cause to believe the defendant committed a statutory violation of some sort. *See, e.g., Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1155 (S.D. Fla. 2007) *("Nor does Plaintiff's arrest become a violation of his constitutional rights because ultimately he was charged with a different crime than the one he was arrested for: '[t]hat a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself.'")* (quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir.1990)).

[20] In fact, Fla. Stat. § 316.221 requires that "[e]ither a taillamp or a separate lamp . . . illuminate with a white light the rear registration plate," thereby expressly authorizing white light to be emitted from a taillight.

unsafe condition.  *See id.* at 294 n.7; *see also Chanthasouxat*, 342 F.3d at 1276-77.

As noted, Deputy Wieszadlo did not testify at the hearing; as a result, there is no evidence in the record regarding Deputy Wieszadlo's observations or the reason he stopped the Defendant's vehicle except as set forth in the offense report.  The photograph of the taillight, however, reveals that the upper, clear lens cover was largely missing but that the lower, red lens cover remained mostly in tact.  According to Officer Lee, who did testify but did not make the decision to initiate the stop, the white light that emitted from the taillight was equivalent to the light from a Mag Lite flashlight and did not create a safety hazard when emitted along with the red light.  Although Officer Lee opined that the emission of white light *could* create an unsafe condition by distorting the vision of a driver following behind the vehicle, he also testified that the light did not impair his vision in any way and that he had no knowledge as to whether Deputy Wieszadlo's vision was impaired.[21]  In short, Officer Lee, the Government's sole witness regarding the reason for the stop, did not support the Government's position that the cracked taillight lens cover supported reasonable cause to believe the vehicle was in an unsafe condition as contemplated by Fla. Stat. § 316.610.[22]  The court thus finds that the Government failed to satisfy its burden of proving that the stop of the Defendant's vehicle was objectively reasonable.  *See Whren*, 517 U.S. at 811; *Chanthasouxat*, 342 F.3d at 1276; *Hilton*, 961 So. 2d at 297 (holding that because the State "presented no evidence that the vehicle was in an unsafe condition to endanger person or property and, correspondingly, no evidence that would support an objectively reasonable suspicion that the vehicle was unsafe in violation of the statute," the State failed to satisfy its burden of demonstrating that the stop

---

[21] It bears noting that drivers routinely are faced with white light illuminating license plates, as required by Fla. Stat. § 316.224, as well as white light from oncoming headlights.

[22] The court's conclusion in this regard is strengthened by the fact that white light emitted only when the Defendant pressed his brake and, therefore, the white light was emitted simultaneously with the red light, not by itself.

of the Defendant was objectively reasonable).[23]

Accordingly, the court concludes that the traffic stop in this case violated the Defendant's Fourth Amendment rights and that all evidence obtained as a result of the stop must be suppressed. The Defendant's Motion to Suppress Evidence (doc. 16), therefore, is **GRANTED**.

**DONE and ORDERED** this 2nd day of July, 2013.


s/ *M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[23] The court notes that this case is distinguishable from *United States v. Weaver*, 145 Fed. Appx. 639 (11th Cir. 2005), in that the officer in *Weaver* reasonably believed, based on his observations as set forth in the record, that the tinting of the windows on the defendant's vehicle was in violation of Fla. Stat. § 316.2953, which "prohibits driving motor vehicles on which the front or side windows have been treated with 'any sunscreening material or other product or covering which has the effect of making the window nontransparent or which would alter the window's color, increase its reflectivity, or reduce its light transmittance' below the statutorily permitted level of 'light transmittance of at least 28 percent in the visible light range.'" *Id.* at 641 (quoting Fla. Stat. § 316.2953). The officer in *Weaver* testified that he stopped the defendant's vehicle after noticing that the officer's vehicle's headlights reflected off the defendant's windows and also because he was unable to see the defendant's silhouette or dashboard lights through the windows despite being only five feet away. When the officer measured the light transmittance the next morning, he determined that it was 19.5 percent, far below the statutory minimum. The court found, based on the officer's testimony regarding his observations, that the officer reasonably believed that the defendant's vehicle violated the window-tint statute and thus had probable cause to stop it. The court rejected the defendant's position that an officer is prohibited from stopping a vehicle based on the window-tint statute without knowing the vehicle's exact light transmittance percentage.

Case No.: 3:13cr17/MCR